UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT, E.D.N.Y.

★ MAY 3 1 2007 ★

BROOKLYN OFFICE

------------------------------------------------------------ X
                                 :

ROBERT SAUNDERS,                     :       04 CV 1156 (ARR)

                 Petitioner,     :       NOT FOR ELECTRONIC
                                   :       OR PRINT
   -against-                         :       PUBLICATION
                                   :

WILLIAM MAZZUCA,             :       OPINION
*Superintendent,*                  :       AND ORDER
*Fishkill Correctional Facility,*    :

                 Respondent.    :
                                   :
------------------------------------------------------------ X

ROSS, United States District Judge:

        Petitioner pro se Robert Saunders filed a petition for a writ of habeas corpus pursuant to

28 U.S.C. § 2254 on March 10, 2004. (Dkt. No. 1.) In his original petition, Saunders raised four

grounds for relief: (1) that the state court denied his right to a public trial by closing the

courtroom; (2) that his trial counsel provided ineffective assistance of counsel by failing to

produce an alibi witness; (3) that the use of homeless persons as "fillers" in a line-up was unduly

suggestive; and (4) that the state court imposed an excessive sentence.

        Petitioner subsequently amended his petition to raise the same four grounds for relief, but

with additional information and attachments (Dkt. No. 4), and respondent submitted an

opposition (Dkt. No. 6). By opinion and order dated September 24, 2004, the court granted

petitioner leave to amend and to file a second amended petition to raise additional claims of

ineffective assistance of trial counsel for waiving an objection to the closure of the courtroom

during petitioner's trial and of ineffective assistance of appellate counsel for failing to raise on

1

direct appeal this alleged error by trial counsel. (Dkt. No. 12; see also Dkt. No. 7.) The court also stayed the petition to enable exhaustion of these ineffective assistance claims. (Dkt. No. 12.)

By order dated September 11, 2006, the court lifted the stay and directed petitioner to file a second amended petition. (Dkt. No. 15.) Thereafter, petitioner filed a Second Amended Petition. (Dkt. No. 19.) Respondent filed a supplemental opposition to this petition (Dkt. No. 20), and petitioner filed a reply (Dkt. No. 21).

For the reasons set forth below, the petition is denied.

## BACKGROUND

Following a jury trial in New York State Supreme Court, Kings County, petitioner was convicted of burglary in the first degree and three counts of menacing in the second degree and sentenced to a term of imprisonment of 10 to 20 years, concurrently with three one year terms.

At trial, the state presented evidence that in the wee hours of the morning of May 25, 1997, several men, including petitioner, brandished guns, entered the first floor apartment of Diane Hudgins, tied up the adult inhabitants, and took jewelry, money, and a VCR. More specifically, the state's witnesses testified to the following version of events: Noise from the kitchen at 3:30 a.m. prompted Ms. Hudgins' boyfriend, Joe Mitchell, to get up from bed and investigate. Once in the kitchen, Mr. Mitchell observed that the kitchen window had been tampered with and saw two individuals outside the window. When Mr. Mitchell asked them whether they had seen anybody by the window, the two individuals—one of whom was identified as petitioner—pulled out guns. Mr. Mitchell told Ms. Hudgins to run away, and she ran back to her daughter Tanya's bedroom while Mr. Mitchell ran to the front door. Three men burst into the apartment through the front door. At some point, five armed men, including petitioner, were in

2

the apartment. They tied up Ms. Hudgins, her boyfriend, and her daughter, but not her three grandchildren. Ms. Hudgins and her daughter testified that petitioner stood at the bedroom door with a gun, telling the other men to kill the inhabitants. The men took various items and left after threatening to harm the inhabitants if they reported the incident to the police.

Petitioner's conviction and sentence were affirmed on direct appeal. See People v. Saunders, 306 A.D.2d 502, 761 N.Y.S.2d 315 (N.Y. App. Div. 2d Dep't 2003). After filing a petition in this court and obtaining a stay, petitioner applied for a writ of error coram nobis and moved to vacate his conviction pursuant to N.Y. Crim. Proc. Law § 440.10. The state courts rejected these applications and petitioner returned to this court.

## DISCUSSION

As an initial matter, petitioner contends that he is actually innocent because a private investigator later determined that bars and gates on the kitchen window must have made it impossible for him, or anyone, to enter the apartment through the kitchen window. "Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." Herrera v. Collins, 506 U.S. 390, 400 (1993). Such a claim must therefore be denied.

However, petitioner asserts two independent constitutional violations based on evidence of bars on the windows: (a) that his conviction was based on perjured testimony in the form of the complaining witnesses' statements that bars were not on the window at the time of the incident; and (b) that trial counsel provided ineffective assistance by failing to investigate the bars on the windows.

3

In addition, petitioner argues that the trial court deprived him of his right to a public trial and, relatedly, that trial counsel was ineffective for waiving his right to a public trial and excluding his family from the courtroom. Finally, petitioner asserts four other claims, which, though he marks them as "deleted" in his second amended petition, the court will nonetheless address.

## A. Conviction Based on Perjury

Petitioner argues that a private investigator hired by his sister determined that inner antiburglary gates, which can be locked from the inside of the apartment, and outer child safety bars covered the kitchen window at the time of the incident and so would have prevented petitioner from entering the apartment through this window. In light of this investigation, petitioner argues that his conviction was based on perjured testimony to the effect that no bars covered the windows at the time of the incident.

### 1. Trial Evidence on Kitchen Window

At trial, the evidence concerning the kitchen window was as follows. A photograph of the apartment depicting the various windows was introduced into evidence. (Trial Ex. 2A, Tr. 38.) (During deliberations, the jury requested and received this photograph and others. (Tr. 386.)) Mr. Mitchell and Ms. Hudgins testified that, although the photograph shows bars, there were no bars on the outside of the kitchen window at the time of the incident. (Tr. 82, 85, 94.) They further testified that there was no lock on the inner gates at the time of the incident. (Tr. 41, 50, 85, 94.)

Mr. Mitchell testified that after petitioner and another man pulled out guns while on the other side of the kitchen window Mr. Mitchell saw them try to climb in through the window and

4

he started for the door. (Tr. 64.) Mr. Mitchell clarified that he could not say that petitioner climbed all the way in through the kitchen window and did not see petitioner inside the apartment, but he believed petitioner got into the kitchen. (Tr. 64-66, 75.)

Ms. Hudgins also testified that she saw petitioner and another man with guns outside the kitchen window. (Tr. 95, 99.) She testified that she saw them climbing in the window. (Tr. 122.) Ms. Hudgins testified that she then ran back to her daughter Tanya's bedroom. (Tr. 99.)

Ms. Hudgins and her daughter Tanya each testified that petitioner was subsequently inside the apartment, standing at Tanya's bedroom door, with a gun, saying, "kill them all" or words to that effect. (Tr. 100, 103, 105, 109, 143-145.)

The assistant super for the apartment building testified about changing the lock on the door shortly after the incident (Tr. 172-175), and defense counsel did not ask him anything about the apartment windows (Tr. 175-178). However, in summation, defense counsel argued that the lack of evidence from the super about repairs to the kitchen window suggested the window was not tampered with in the incident. (Tr. 303-304.)

The defense called one witness, Robert Holt, a private investigator, who testified that he measured an apartment window to be more than five feet above the ground (Tr. 260), although this was not the kitchen window in question, which Mr. Holt acknowledged was lower down (Tr. 264-265).

### 2. Petitioner's Investigation of Kitchen Window

Petitioner has submitted the following evidence to support his claim that gates and bars were on the kitchen window at the time of the incident.

The private investigator hired by petitioner's sister questioned the current occupant of

5

Ms. Hudgins' apartment and took photographs of the kitchen window. The photographs show inner gates with a lock and outer child safety bars. (See Pet. Exs. B, C.) The current occupant told the investigator that the gates and bars were on the window when she moved into the apartment in February 1998. (See Johnston Aff. at 2.) The investigator submitted a freedom of information request form to the New York City Housing Authority ("NYCHA"), asking for information about the kitchen window "as to repairs, manufacturer of the window, tools needed to remove the window, date of initial installation and any repairs from 05/25/97 to the current date." (Id. at 3.)

NYCHA's response to the request named an architectural products company and indicated that work was performed in 1987. (Pet. Ex. D.) NYCHA's response goes on to state, "A further diligent search [of NYCHA records] failed to disclose any work to the specified kitchen window since May 25, 1997." (Id.)

Petitioner also submits affidavits from relatives to establish that bars and gates on the kitchen window would have prevented his entry. Petitioner's father avers that he and his family have lived in the same building for over 25 years "and the bars and security gates are still in place on the windows." (George Saunders Aff. at ¶ 10.) He further avers that the same bars and gates were installed in the first floor apartments in approximately 1988. (Id. at ¶ 11.) In addition, he avers that someone in the building's management office confirmed that the windows were installed from the inside to hinder removal from the outside and bars and gates cover the window. (Id. at ¶ 4-6.) Petitioner's sister similarly avers that she has personal knowledge, as a resident of the building from 1977 until 1990, that these bars and gates were installed on first floor apartment windows in 1988. (Hope Clarke Aff. at ¶ 8-9.)

### 3. Legal Standard & Application

A conviction based on perjured testimony is analyzed under the Due Process Clause of the Fourteenth Amendment. Napue v. Illinois, 360 U.S. 264, 269 (1959) (citations omitted). The petitioner has the burden of demonstrating, by a preponderance of evidence, that the witness committed perjury, see Ortega v. Duncan, 333 F.3d 102, 106 (2d Cir. 2003), and, in determining whether "testimony given at trial was in fact truthful," a court must "weigh all the evidence of perjury before it." Id. at 107. A conviction must be set aside if "the prosecution knew, or should have known, of the perjury," and "there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." United States v. Agurs, 427 U.S. 97, 103 (1976). The Second Circuit held in Ortega that, "when false testimony is provided by a government witness without the prosecutions' knowledge, due process is violated only if the testimony was material and the court is left with a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted." 333 F.3d at 108 (internal quotation marks and citations omitted) (emphasis added).

Petitioner presented this claim to the New York state courts in his 2005 motion under New York Crim. Pro. Law § 440.10, which was dismissed in its entirety. See People v. Saunders, Ind. No. 6604/97 (N.Y. Sup. Ct., Kings Co., Nov. 23, 2005). On July 5, 2006, the Appellate Division denied petitioner leave to appeal the trial court's order. The 440 court recast petitioner's claims of perjured testimony and ineffective assistance as a § 440.10 motion based on newly-discovered evidence and denied the motion on the ground that "the presence of security gates in the kitchen window does not constitute newly discovered evidence." See id. at 4-5. The 440 court seems not to have distinguished between the trial testimony about the inner, unlocked

security gates and the alleged outer child safety bars. The 440 court held, "The jury saw photographs of this window, heard testimony that the gates were unlocked and penetrable, and returned a guilty verdict, rendering it highly improbable that a more ample discussion of this evidence would change the result if a new trial is granted, particularly since the mode of entry of the defendant and his cohorts will not materially alter the finding that they burglarized the premises." (Opinion at 5.)

Regardless of the level of deference to be afforded this state court decision, petitioner's claim fails because petitioner has not established that any of the prosecution witnesses committed perjury. See Campbell v. Greene, 440 F. Supp. 2d 125, 147 (N.D.N.Y. 2006) (holding that petitioner failed to established that any of the testimony was, in fact, perjurious).

The trial testimony clearly established that at the time of the incident there were inner antiburglary gates on the kitchen window and, moreover, that the gates were not locked at the time of the incident. Petitioner offers nothing whatsoever to contradict this evidence about the window.

The only questions raised by petitioner's allegations are whether or not at the time of the incident there were child safety bars on the outside of the kitchen window and, consequently, whether it would have been possible to enter the apartment through the window. The only evidence petitioner submits in this regard are the affidavits of his sister and father. The evidence obtained by the hired investigator does not establish that gates and bars were on the windows at the time of the incident. The comments of the current occupant post-date the incident. And as respondent points out, the investigator's freedom of information request inquired about the window and not the gates or bars. (Resp. Mem. 11.) NYCHA's response does not indicate

8

anything whatsoever about security gates or child safety bars.

This leaves the affidavits from petitioner's relatives, who purport to have personal knowledge of the bars and gates on the first floor apartment's window based on their residence in the same building. At most, petitioner has shown only that his relatives attest to information contradicting the trial testimony of other witnesses. But "even a direct conflict in testimony does not in itself constitute perjury." United States v. Gambino, 59 F.3d 353, 365 (2d Cir.1995); see also United States v. Monteleone, 257 F.3d 210, 219 (2d Cir. 2001) ("A witness commits perjury if he gives false testimony concerning a material matter with the willful intent to provide false testimony, as distinguished from incorrect testimony resulting from confusion, mistake, or faulty memory. Simple inaccuracies or inconsistencies in testimony do not rise to the level of perjury." (internal citations omitted)); United States v. Nazario, No. 04 Crim. 796, 2006 WL 3375391, at *4 (S.D.N.Y. Nov. 17, 2006) ("Perjury is not demonstrated by showing that the testimony of a witness is inconsistent with the statements of another witness.").

Petitioner has failed to demonstrate that the complaining witnesses perjured themselves, let alone that the prosecution knew or should have known of the alleged perjury. For these reasons, petitioner is not entitled to relief on this claim. Nor is petitioner entitled to an evidentiary hearing to further develop this claim. See 28 U.S.C. § 2254(e)(2); see also Schriro v. Landrigan, No. 05-1575, 550 U.S. —, slip op. at 6-7 (May 14, 2007) ("[I]f the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing."); cf. Drake v. Portuondo, 321 F.3d 338, 345-46 (2d Cir. 2003) (remanding habeas petition for discovery and possible hearing on whether prosecution knew or should have known of perjured testimony at trial).

9

*B. Ineffective Assistance of Trial Counsel for Failure to Investigate*

Petitioner also relies on the post-trial investigation of the kitchen window to argue that trial counsel provided ineffective assistance by failing to investigate the bars on the windows. To bolster this claim, petitioner recites the trial court's statement that "there is a lack of diligence then with respect to how this case was investigated." (Tr. 9.) The context for this comment, however, makes clear that the trial court was discussing defense counsel's eve-of-trial alibi witnesses. In response to the prosecution's motion to preclude this testimony based on late notice, defense counsel explained the late notice by stating that facts were "still creeping in" (Tr. 5), prompting the court's comment. Petitioner does not make any claim that trial counsel was ineffective for failing to investigate alibi witnesses.

Petitioner's claim that trial counsel was ineffective for not conducting as thorough an investigation of the kitchen window as petitioner's private investigator subsequently did must fail because petitioner cannot satisfy the prejudice prong of <u>Strickland v. Washington</u>, 466 U.S. 668, 694 (1984).

Even assuming counsel's performance can be found to fall below an objective standard of reasonableness under prevailing professional norms for failing to investigate and discover facts already known to his client and his client's relatives, this claim fails because petitioner cannot demonstrate a reasonable probability that, but for counsel's allegedly unprofessional errors, the result of the proceeding would have been different.  See <u>Strickland</u>, 466 U.S. at 694-97.

Although the evidence at trial was unclear as to whether petitioner entered the apartment through the kitchen window—confusion about which is understandable in light of the testimony by Mr. Mitchell and Ms. Hudgins that petitioner and another man, when questioned about

10

tampering with the kitchen window, brandished guns and soon thereafter other armed individuals burst into the apartment through the front door–other testimony clearly placed petitioner inside the apartment during the course of the burglary. Ms. Hudgins and her daughter each testified that petitioner was subsequently inside the apartment, brandishing a gun, and telling his accomplices to kill the inhabitants. Based on the evidence depicting the kitchen window with bars after the incident and defense counsel's argument on the lack of evidence of any tampering with the window, the jury could very well have believed petitioner ran around and entered through the door, as the others had. Indeed, defense counsel sought to impeach Mr. Mitchell's credibility by pointing out that at one point Mr. Mitchell had told a detective that five people had pushed through the door, not three. (Tr. 198-199.)

Moreover, even if counsel had managed to convince the jury that petitioner had not climbed through the kitchen window–because of the bars or some other reason–or had not even entered the apartment at all, the jury would have reached the same conclusion. The jury was instructed that petitioner could be found guilty on an acting-in-concert theory. (Tr. 360-63.) The testimony concerning petitioner's conduct outside the kitchen window firmly establishes petitioner's guilt on that basis.

Thus, even if petitioner's counsel had unearthed NYCHA records and testimony from petitioner's relatives about the impenetrability of the kitchen window and used them to impeach the complaining witnesses, the result of the trial would not have been any different.

*C. Courtroom Closure*

Petitioner claims that he was denied his Sixth Amendment right to a public trial by the courtroom's closure during jury deliberations and, relatedly, that he was denied effective

11

assistance of counsel by his trial counsel's waiver of his right to a public trial.

*1. The Courtroom Closure*

On the first day of the jury's deliberations, the trial court learned that two jurors had expressed concern that a car followed them on their dinner break and that petitioner's "family members may have been looking at them in a certain way, which created a certain degree of apprehension." (Tr. 413-14.) Defense counsel informed the court that the acquaintances of petitioner who were present in the audience were petitioner's mother, twin sister, brother, and girlfriend. (Tr. 416-17.) The trial court asked the entire jury if anyone wanted to discuss such apprehension, but no juror responded. (Tr. 419.) The trial court then inquired individually of the two jurors who had initially expressed concern. (Tr. 421-27, 430-31.)

Juror # 6 explained that someone in the audience, perhaps a relative of petitioner, gave "dirty looks" and told the juror to pay attention. (Tr. 422-23.) The other juror, Juror # 2, explained that she had seen petitioner's relatives as she boarded the bus for dinner and then saw a car following the bus. (Tr. 424-25.) Defense counsel informed the court that petitioner's girlfriend might have been outside. (Tr. 424.) A court officer informed the court that he had not seen petitioner's relatives outside when boarding the bus. (Tr. 427.)

The prosecutor informed the court that petitioner and his relatives were "giving dirty looks during" the trial. (Tr. 428.)

The trial court announced that she would admonish the audience not to communicate. (Tr. 428.) Petitioner's counsel said, "I'm going to have the audience out of there." (Tr. 428.) Counsel went on to sate,

> Your Honor, I've been going through this every time we were

12

> outside and I'm through. We started off and I fabricated things and
> I'm through. What I want to say is, your Honor knows this Court
> knows there was no one sitting in the courtroom until the time
> when the girlfriend came in. I let no one in the court room,
> specifically not to hurt and not to make any insinuation about
> anything and I thought it was fair to come into court now. I will
> take them out of the courtroom now. I don't want anything like
> this. (Tr. 429.)

Co-counsel went on to state that the jurors were "clearly prejudiced. They don't realize it might

not have been this family. It was not his family in the court, they're still going to attribute that in

the back of their mind to the defendant and his family. They're biased. They're intentionally

biased." (Tr. 429-430.)

The trial court then stated, "I don't know what the audience has created here with respect

to intimidation or fear. You indicated you're going to have them leave, then have them leave the

court room." (Tr. 430.) To which counsel said, "Absolutely." (Tr. 430.)

The court then reassured Juror # 2 that "there were no family members in that car. . . . I

want to reassure you that car, the people in that car were not in any way connected with this case

and that the family did not own a car and they were not in that car at the time that you left." (Tr.

430-31.)

Deliberations then resumed. (Tr. 431.) After excusing the jurors for the evening, the

court heard and denied defense counsel's request for a curative instruction about acting in concert

(Tr. 432-35) and denied petitioner bail, remanding him for the night (Tr. 435-37).

On the second day of deliberations, the jury sent a note indicating a verdict on five of the

counts and a question from Juror # 9. (Tr. 438.) The trial court discussed the juror's question

with him (Tr. 440-41) and then proceeded to ask individually each of the ten jurors not

13

questioned the previous day whether anything of concern had transpired between the audience and the jurors and whether there had been any discussion of this among the jurors (Tr. 441-457). Some of the jurors indicated awareness that two jurors had been concerned, but none of the jurors indicated any further concern or that this affected his or her ability to deliberate fairly and impartially. The court then further examined Juror # 9 to figure out what his question was and whether it affected the report of a verdict reached on some counts. (Tr. 458-65.) The court then took the verdict from the jury–guilty of burglary and three counts of menacing, not guilty of grand larceny–polled the jury, and instructed the jury to continue deliberating on the remaining counts, charging robbery. (Tr. 466-72.)

The jury later sent a note with questions about robbery and reasonable doubt and an indication that Juror # 6 wished to speak with the court. (Tr. 473.) The juror asked the court a legal question about robbery (Tr. 477-78) and then the court instructed the entire panel on reasonable doubt, credibility, falsus in uno, and the robbery counts (Tr. 479-90). The jury then resumed deliberations, the court heard defense counsel's objection to the robbery charges just read, and then sent the jury to dinner. (Tr. 490-92.) Later that evening, the jury sent a note indicating its inability to reach a unanimous verdict on the robbery counts. (Tr. 492-93.) The parties consented to a mistrial, which the court granted, and the jurors were excused. (Tr. 493-96.)

### 2. Sixth Amendment Public Trial Right

Petitioner argued on direct appeal that the trial court had denied him his right to a public trial. The Appellate Division summarily rejected this claim as "without merit." See People v. Saunders, 306 A.D.2d 502, 503, 761 N.Y.S.2d 315, 316 (N.Y. App. Div. 2d Dep't 2003). This

14

decision is entitled to deference under 28 U.S.C. § 2254(d). The court finds that this decision is neither contrary to, nor an unreasonable application of, clearly established federal law, nor based on an unreasonable determination of the facts.

Having reviewed the record in this case, the court finds that petitioner's counsel waived his Sixth Amendment right to a public trial. It is well established that "a defendant can, under some circumstances, waive his constitutional right to a public trial." Singer v. United States, 380 U.S. 24, 35 (1965). "A defendant who waives his right to a public trial cannot thereafter complain that his conviction was obtained in violation of that right." Houston v. McGinnis, No 97 Civ. 6862, 1999 WL 1129613, at *5 (E.D.N.Y. Oct. 13, 1999). In Peretz v. United States, the Supreme Court approvingly cited the holding of Levine v. United States, 362 U.S. 610, 619 (1960), stating that a "failure to object to [the] closing of [the] courtroom is [a] waiver of [the] right to [a] public trial." 501 U.S. 923, 936 (1991).

In Levine, the Supreme Court held that the right to a public trial under the Due Process Clause–since, as it held, see 362 U.S. at 617, the Sixth Amendment does not itself apply to criminal contempt proceedings–was not violated where the public's exclusion was continued

> without a request having been made to the trial judge to open the courtroom at the final stage of the proceeding, thereby giving notice of the claim now made and affording the judge an opportunity to avoid reliance on it. This was not a case of the kind of secrecy that deprived petitioner of effective legal assistance and rendered irrelevant his failure to insist upon the claim he now makes. Counsel was present throughout, and it is not claimed that he was not fully aware of the exclusion of the general public. . . . Due regard generally for the public nature of the judicial process does not require disregard of the solid demands of the fair administration of justice in favor of a party who, at the appropriate time and acting under advice of counsel, saw no disregard of a right, but raises an abstract claim only as an afterthought on appeal.

15

362 U.S. 610, 619-20.

The court agrees with the decisions of other courts in this Circuit that <u>Levine</u> is applicable to habeas petitioners claiming violation of their Sixth Amendment public trial rights. <u>See</u> <u>Stapleton v. Greiner</u>, No 98 Civ. 1971, 2000 WL 1207259, at *10 (E.D.N.Y. July 10, 2000) (habeas petitioner waived his right to public trial, with petitioner's consent noted by counsel); <u>Houston v. McGinnis</u>, 1999 WL 1129613, at *5-*7 (E.D.N.Y. Oct. 13, 1999) (habeas petitioner waived public trial right by counsel's withdrawal of objection to closure); <u>Vineski v. Scully</u>, No. 90 Civ. 2570, 1993 WL 22159, at *5-*6 (S.D.N.Y. Jan. 28, 1993) (habeas petitioner not denied public trial right when no objection made to closure of hearing).

In this case, when the trial court was considering what to do about jurors' concerns that petitioner's relatives were giving them "dirty looks" and possibly intimidating them, petitioner's counsel clearly stated that he would have petitioner's relatives and girlfriend leave the courtroom. Counsel further indicated that he had been trying to keep them out of the courtroom from the beginning of the trial, but thought that, since the jury had begun deliberating, "it was fair to come into court now." In light of the jurors' concerns, petitioner's counsel seemed to realize that he had been mistaken, and said he would "take them out of the courtroom now. I don't want anything like this." (Tr. 429.) The trial court accepted this resolution of the situation. (Tr. 430.)

Under these circumstances, the court finds that petitioner's counsel waived his right to a public trial.[1] Furthermore, the court is aware of no Supreme Court precedent holding that the

---

[1] The court notes that, although the record is not clear, the "closure" about which petitioner complains was exceedingly limited. The record does not reflect who specifically was excluded from the courtroom, nor for what portion of the remaining proceedings. However, the only proceedings resulting in petitioner's conviction that remained were: on that day, the jury's remaining deliberations for the evening; the denial of a motion for a curative instruction; and the

16

public trial right may be waived only by the defendant himself or by counsel only after consultation with the defendant.[2] Levine itself suggests that the right to a public trial is one of those rights whose waiver may be effected by action of counsel. See Roque v. Phillips, No. 04 Civ. 4337, 2007 WL 777764, at *7 (E.D.N.Y. Mar. 12, 2007) (citing Peretz, 501 U.S. at 936 (citing Levine, 362 U.S. at 619)) ("[T]he Supreme Court has determined that a defendant need not personally waive his Sixth Amendment right to a public trial because a defense attorney may constitutionally waive a defendant's right to a public trial by failing to object to the courtroom closure.").

In addition, the Supreme Court has distinguished between the fundamental rights to counsel and to plead not guilty, which require personal waiver by the defendant, and other rights "pertaining to the conduct of the trial," whose "waiver may be effected by action of counsel." New York v. Hill, 528 U.S. 110, 115 (2000). "Thus, decisions by counsel are generally given effect as to what arguments to pursue, what evidentiary objections to raise, and what agreements to conclude regarding the admission of evidence. Absent a demonstration of ineffectiveness, counsel's word on such matters is the last." Id. (internal citations omitted). Because it implicates courtroom tactics, the right to a public trial would seem to be one of those rights counsel may waive. Indeed, the Second Circuit has held that a defense attorney's failure to

---

denial of bail; and, on the following day, further deliberations; the examination of each juror about the intimidation; and then the jury's verdict on the counts of which petitioner was convicted.

[2] In an unpublished summary order, the Second Circuit held that "there is no clearly established binding precedent as to either whether personal waiver of the right to a public trial is constitutionally required, or as to whether waiver by counsel requires consultation with a client." Daughtry v. Greiner, No. 01-2466, 2002 WL 31819589, at *1 (2d Cir. Dec. 16, 2002).

object to the partial closure of the courtroom due to intimidation of a trial witness by audience members waived his client's public trial right as a matter of trial strategy. See United States ex rel. Bruno v. Herold, 408 F.2d 125, 129 (2d Cir. 1969). The record here similarly reflects that counsel's waiver of petitioner's rights was done for a strategic reason.

For these reasons, the court finds that the state courts' rejection of petitioner's public trial challenge to his conviction is neither contrary to, nor an unreasonable application of, clearly established federal law, nor based on an unreasonable determination of the facts.

*3. Trial Counsel's Ineffectiveness for Waiving Public Trial Right*

Petitioner further argues that he was denied the effective assistance of counsel by his trial counsel's waiver of his public trial right. As respondent argues, this claim was not exhausted. (Resp. Mem. 17-18.) Petitioner only presented this claim to the state courts in his application for a writ of error coram nobis, arguing that appellate counsel was ineffective for failing to argue that trial counsel should not have waived his public trial right. However, a petition for a writ of error coram nobis does not exhaust the underlying claims advanced to support the claim of ineffective assistance of appellate counsel. Turner v. Artuz, 262 F.3d 118, 123 (2d Cir. 2001).

Although this claim is unexhausted, the court nevertheless opts to exercise its discretion to deny it on the merits because it is "patently frivolous." See 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the state."); see also Pratt v. Greiner, 306 F.3d 1190, 1197 (2d Cir. 2002) (recognizing that district court may deny on the merits unexhausted habeas claims); Wheeler v. Phillips, No. 05 Civ. 4399, 2006 WL 2357973, at *5 (E.D.N.Y. Aug. 15, 2006) ("The law is unsettled in the Second Circuit regarding the proper

18

response to habeas petitions containing unexhausted claims. A majority of district courts in the Second Circuit dismiss unexhausted claims that are 'patently frivolous.'").

Petitioner cannot satisfy either prong of the <u>Strickland</u> test for effective assistance of counsel. The record reflects that counsel's decision to waive petitioner's public trial right was a "strategic" decision difficult to disturb on habeas review, that is, a "conscious, reasonably informed decision made by an attorney with an eye to benefitting his client." <u>See</u> <u>Pavel v. Hollins</u>, 261 F.3d 210, 218 (2d Cir. 2001). Counsel had already been concerned with the potential prejudice to petitioner that might result from the presence of petitioner's relatives and girlfriend in the audience of the courtroom. The jurors' concerns confirmed counsel's fears. Counsel's strategic decision to exclude petitioner's acquaintances from the courtroom in order to avoid any further risk of prejudice to his client arising from the jurors' perceptions of intimidation cannot be said to fall below "an objective standard of reasonableness" under "prevailing professional norms." <u>See</u> <u>Strickland</u>, 466 U.S. at 687-88.

In addition, petitioner has failed to establish "a reasonable probability that, but for counsel's [waiver of his public trial right,] the result of the proceeding would have been different." <u>Strickland</u>, 466 U.S. at 694. Although the trial court, in the absence of counsel's waiver, might have only admonished the audience instead of excluding petitioner's acquaintances, petitioner cannot show that their exclusion during the jury's final deliberations, when so little took place in the courtroom, somehow "undermine[s] confidence in the outcome" of his trial. <u>See</u> <u>id.</u> For these reasons, petitioner is not entitled to relief on this claim.

*D. Petitioner's "Deleted" Claims*

In his second amended petition, petitioner lists four additional claims. However,

19

petitioner marks each of these claims as "DELETED" and declines to set forth the supporting

facts for these claims, as he did with the preceding claims. The "deleted" claims are: (1)

ineffective assistance of appellate counsel; (2) ineffective assistance of trial counsel for failing to

produce alibi witnesses; (3) unduly suggestive identification line-up due to use of homeless

persons as fillers; and (4) imposition of an excessive sentence. Petitioner does not discuss these

claims in his reply brief. (See Dkt. No. 21.)

Petitioner raised the first claim in his coram nobis application after obtaining a stay of the

instant petition. Petitioner raised the other three "deleted" claims on direct appeal and in his

original and first amended petitions in this court. The court finds that petitioner's treatment of

these claims in his recent submissions signifies his intention to abandon these claims.

In any event, petitioner is not entitled to habeas relief on these claims. The Appellate

Division decisions rejecting these claims—in petitioner's coram nobis application, People v.

Saunders, 16 A.D.3d 440 (N.Y. App. Div. 2d Dep't 2005), and direct appeal, People v. Saunders,

306 A.D.2d 502 (N.Y. App. Div. 2d Dep't 2003)—are neither contrary to, nor an unreasonable

application of, clearly established federal law.

## CONCLUSION

For the foregoing reasons, the court denies the instant petition for a writ of habeas corpus.

No certificate of appealability is granted with respect to any of the petitioner's claims, since the

petitioner failed to make a substantial showing of any denial of his constitutional rights. The

petitioner has a right to seek a certificate of appealability from the United States Court of

Appeals for the Second Circuit. See 28 U.S.C. § 2253.

SO ORDERED.

/S/

Allyne R. Ross
United States District Judge

Dated:      May 30, 2007
               Brooklyn, New York

SERVICE LIST:

*Pro Se* Petitioner
Robert Saunders
# 98A2402
Wallkill Correctional Facility
Route 208, Box G
Wallkill, NY 12589-0286


Attorney for Respondent
Solomon Neubort
Kings County District Attorney
350 Jay Street
Brooklyn, NY 11201